No. 16,240.

Dearhammer et al. *v.* Central Bank and Trust
Company.
(221 P. [2d] 1065)

Decided July 17, 1950.   Rehearing denied September 5, 1950.

Mr. Harold B. Wagner, Mr. Carl A. Wyers, for plaintiffs in error.

Messrs. Ireland & Ireland, for defendant in error.

*En Banc.*

Mr. Justice Alter delivered the opinion of the court.

Mabel M. Dearhammer and Mildred G. Dearhammer brought an action against Schuyler L. Kirtley, The Central Bank and Trust Company, a Colorado corporation, and Andrew Johansen and C. Louise Johansen, individually, and as partners doing business as Western Sales and Finance Company, to recover compensatory and punitive damages; for a body judgment against

Kirtley; for the return of certain property; and the establishment of a trust and accounting against the defendants. Upon stipulation of counsel for plaintiffs and defendant Kirtley, the court, on June 22, 1948, entered its judgment in favor of plaintiffs and against Kirtley for the sum of $16,434.04.

Herein Mabel M. Dearhammer will be designated by name or as mother; we will refer to Mildred G. Dearhammer as Mildred or as daughter; The Central Savings Bank and Trust Company as bank; and Kirtley by name or as defendant.

Trial on the complaint and answer of defendant bank was had to the court, with a jury sitting in an advisory capacity, and, at the conclusion of all of the evidence, on oral motion of counsel for the bank to dismiss the action as to it, the same was granted, and thereupon judgment was entered in favor of the bank and against plaintiffs with costs. Plaintiffs have sued out a writ of error, seeking a reversal of the judgment.

The judgment entered by the court on stipulation of counsel for plaintiffs and defendant Kirtley judicially determined plaintiffs' rights as against Kirtley growing out of business transactions hereinafter mentioned, and no objection here appearing to that judgment, it need not be given further consideration.

In the amended and supplemental complaint, so far as the same pertains to the litigation between plaintiffs and the bank, it is alleged that plaintiff Mabel M. Dearhammer is an aged widow, and that her daughter, Mildred, was unmarried at all times mentioned in the pleadings, neither of these women having had business experience and both of them susceptible to being defrauded and deceived by any dishonest person. Further it is alleged that defendant Kirtley gained a domineering influence over plaintiffs by threatening to have both adjudged insane and committed to an insane asylum, and by use of threats obtained from plaintiffs between April 15, 1946, and September 11, 1946, the sum of

$16,434.04. It further is alleged that on May 15, 1947, Kirtley executed his promissory note in the sum of $15,312.50, due August 11, 1947, with interest thereon at the rate of one per cent per month, to secure the repayment of money which he had theretofore obtained from the bank, and collaterally secured his said note with other notes together with deeds of trust and chattel mortgages securing the same, which other notes were allegedly purchased with moneys which Kirtley had obtained from plaintiffs. It also is alleged that the loans evidenced by notes and deeds of trust and chattel mortgages collaterally securing Kirtley's note of May 15, 1947, were subject to a trust in favor of plaintiffs to the extent that their funds were used to acquire the same, and that the bank knew, or in the exercise of reasonable care, should have known, that Kirtley had used funds belonging to plaintiffs with which to acquire these securities, and that plaintiffs have an equitable interest therein superior to any claim of the bank. It further is alleged that upon the securities pledged by Kirtley, as collateral to his note, payments have been made to Kirtley with the knowledge and consent of the bank, and the value of the securities to the extent of these payments depreciated.

The plaintiffs sought judgment against the bank, establishing that they are equitably entitled to the collateral securing the Kirtley note of May 15, 1947, to the extent that their funds are invested therein; determining that their rights to these loans are superior to the claim of the bank; prohibiting the bank from surrendering possession of the collateral security pending the determination of this action; for a judgment against the bank in an amount equal to all payments made upon the collateral security, whether collected by it or by Kirtley or others, and for general relief.

As hereinbefore stated, at the conclusion of all of the evidence the court granted the bank's motion to dismiss the action, and in so doing must have determined that

there was no fact presented upon which it desired the jury's advice and assistance. As we view the record, plaintiffs' cause of action against the bank must rest almost entirely upon the testimony of Mildred and Kirtley, and this because the aged mother apparently participated only slightly in the business transactions between her daughter and Kirtley which gave rise to this action.

The evidence offered by plaintiffs in support of their cause of action against the bank consisted of their own testimony, together with that of two officers of the bank called for cross-examination, Kirtley, and documentary evidence. It may be thus summarized:

Kirtley testified that he was a police officer in the city of Denver and had been thus employed for approximately twenty-two years. As evidenced by the judgment against him, he received the following sums from Mildred on the dates indicated:

| April 15, 1946 | $ 700.00 |
| April 30, 1946 | 3,500.00 |
| May 9, 1946 | 4,733.76 |
| September 11, 1946 | 3,700.00 |

He received from Mabel M. Dearhammer on September 11, 1946, the sum of $3,800.00.

It appears that Kirtley became acquainted with Mildred through a real-estate loan in which he was interested, and some time later became acquainted with Mabel M. Dearhammer and her husband, at which time the husband was bedfast. In the spring of 1946, he and Mildred discussed entering into the business of making business chance loans; Mildred to furnish the finances to prosecute the business, but she definitely insisted that it be carried on in his name and that her connection therewith be absolutely secretive to the extent that she wanted neither her father nor her mother to know of the arrangement. The first loan that was made was for the purpose of redecorating a tavern in which Kirtley was financially interested, and the second and third

loans were made for the purpose of acquiring a stock of liquors to be used therein. Other loans to him were used in making business chance loans, and all of the money he received was deposited to his credit in the bank, upon which account he alone was authorized to draw checks. On January 31, 1947, and about six months subsequent to her husband's death, Mabel Dearhammer executed a power of attorney generally authorizing Kirtley to handle her business affairs; later, on February 10, 1947, she executed another power of attorney to meet some requirements of the bank. Prior to January, 1947, Mildred had, at Kirtley's suggestion, removed five notes, payable either to Mabel M. Dearhammer or both the mother and her daughter, secured by deeds of trust, from a small safe in plaintiffs' residence and placed them in Kirtley's safety deposit box at the bank, to which Mildred had access, and these five loans, the notes being endorsed by Kirtley, were subsequently used by the latter as collateral for moneys which he borrowed to further finance his operations. These notes and deeds of trust so used by Kirtley were subsequently returned to Mabel M. Dearhammer, and, so far as the record shows, she sustained no financial loss in connection therewith, except interest payments thereon, if any. Mildred frequently went with Kirtley to the bank and knew that he was depositing the moneys received from her in his personal account and that the business chance loans made by him were used as collateral. At no time did she advise the bank, or any of its officers, of the business arrangement existing between her and Kirtley.

Mabel M. Dearhammer testified that she was a widow, seventy-three years of age, and lacking business experience; that on January 31, 1947, when she was still grieving over her husband's death, Kirtley came to her home and requested her signature to a document which she was not permitted to read, and of the contents of which she was not advised; that subsequently she signed another document for Kirtley under the same circum-

stances. She further stated, when shown the two powers of attorney—for such were the documents which she signed—that she had never appeared before anyone to acknowledge the same; that she never intended to entrust Kirtley with her business transactions or with her securities, and, in fact, knew nothing about Kirtley having possession of her real-estate mortgages, subsequently returned to her, until after differences had arisen between Kirtley and Mildred.

Mildred testified that some time prior to April, 1946, she became acquainted with Kirtley through a real-estate agent in connection with a loan on property in which Kirtley was interested. She corroborated Kirtley's testimony with reference to the sums loaned him and the dates and purposes for which the loans were made. With reference to the business arrangement between herself and Kirtley, she testified: "Q. And I believe you said, while there wasn't any definite agreement about this money, that you were loaning to him, you expected it would return you about six per cent; is that correct? A. At least that, because we was getting that on the 6% mortgage loans. * * * Q. Did Mr. Kirtley, at any time, invest this money that you loaned to him, in any manner, contrary or different to what you expected him to invest it? A. I had no idea where he was investing it. He told me he had better chances than I would, to know about good investments; and he was out in the business world to hear of good things, and I rather assumed that he would have a better return than we had, on first mortgage loans. Q. It is a fact isn't it Miss Dearhammer, he did invest this money somewhere, in something? A. I believe he did. Q. So he didn't violate any arrangement he had with you, as to investing it; he did invest it somewhere? A. Not his own money; he was supposed to do something for my mother and myself; he was supposed to be investing for us; it was our money. Q. Was that part of your agreement? A. I naturally thought so. Q. Beg pardon? A. I thought

so. Someone was making investments with my money; I supposed it would be in my name and my mother's name. Q. Where did that happen; you and he agreed these investments were to be made in your name, or your mother's name? A. We never had any agreement about anything. Q. It was an assumption on your part, he would probably make out these loans in your, or your mother's name? A. I thought so. Q. When did you discover he had not been doing that? A. Well at the end of the first year, in 1946, when I asked him about our share of the loan; what the return was; to make out my income tax."

She testified that the loan of $700 was to be used to decorate a tavern, while the loans of $3,500 and $4,337.76 were to be used by Kirtley to purchase liquor. She frequently went to the bank with Kirtley; knew that the moneys which she was giving him were deposited in his individual checking account; and also admitted that she knew that the securities evidencing the business chance loans which Kirtley was making were being used as collateral by him. Kirtley gave Mildred no note or other memorandum of any moneys loaned him by her, and the only time that notes were requested, she was satisfied when he told her that this was unnecessary, that she could trust him. She admitted that the relationship between her and Kirtley far exceeded that ordinarily arising out of business transactions, and that they contemplated marriage.

During her direct and cross-examination she more than thirty times characterized the transactions between herself and Kirtley as loans, and stated that until September 11, 1946, she withheld the fact that she was loaning money to Kirtley from her mother and father, but stated that on September 11, 1946, her mother consented to loan Kirtley $3,800. Mildred also admitted that she had definite information about some of the business chance loans made by Kirtley and had kept records

respecting the same showing the amount of the loans and the monthly installments to be paid thereon.

It appears that some time prior to July, 1947, differences arose between Mildred and Kirtley which prompted plaintiffs to consult an attorney, and, as a result thereof, on July 14, 1947, counsel wrote the bank stating that he was advised that the bank held certain securities as collateral to Kirtley's note in the sum of $15,312.50 which would become due on August 11, 1947. In this letter reference was made to five notes and deeds of trust which counsel stated had been entrusted to Kirtley for safe keeping by Mabel M. Dearhammer and which he had, under his power of attorney, endorsed and used as collateral, and also referred to business chance loans acquired by Kirtley with moneys furnished by the plaintiffs. In this letter is the following: "They [plaintiffs] further state that they made numerous demands on Mr. Kirtley for a return of the documents belonging to them and for *repayment of the money which he borrowed from them,* but that no such settlement has been made or tendered." (Italics ours) In the letter the bank is requested that pending settlement between plaintiffs and Kirtley none of the assets belonging to, or appearing to belong to, Kirtley be turned over to him, even though his note is paid in full. There also appears in the record a letter addressed to Kirtley by counsel, under date of July 19, 1947, with reference to a settlement of the business transactions between plaintiffs and Kirtley, and in which it is stated that Kirtley had violated the confidence reposed in him by plaintiffs in several respects. From this letter is the following:

"They turned over to you a number of Denver real estate loans to be kept in secure custody in your safety deposit box. Instead, you have undertaken to pledge them (along with certain other collateral) to The Central Bank and Trust Company of Denver, as security for

your own promissory note in the principal amount of $15,312.50;

"*They lent you more than $16,000 in cash, which you have failed to repay, and for which you have even denied liability on certain occasions, although at other times you have admitted owing it;*

\* \* \*

"If you can arrange to redeem the Clark, Weiser, Biggs, Baxter, and Gullett loans from The Central Bank and Trust Company and return them to the Dearhammers, *together with the cash which you borrowed from the Dearhammers,* plus interest at 6%, we shall regard the account as closed.

"However, the out-of-town taverns and other enterprises into which you put the Dearhammers' money are of such a doubtful and speculative nature that immediate liquidation may not be possible. If this is the case, you may indicate your present good faith in this way:

"Give me immediately a full statement of all your financial transactions with the Dearhammers, showing the investments placed in your custody, and the dates and amounts of *cash loans made by the Dearhammers to you;*

\* \* \*

"This matter has already been delayed too long, and prompt action on your part is required. Settlement according to either of the above plans may be made at my office by 5:00 p. m. on Tuesday, July 22, 1947; otherwise, we shall start action against you for the return of the investments, *for repayment of the money which you borrowed,* for punitive damages, and for a body judgment." (Italics ours)

There was no satisfactory compliance with these demands made by plaintiffs on Kirtley. On July 31, 1947, a summons was issued and served, and on August 25, 1947, this action was docketed in the district court. By some arrangement, not clearly appearing in the record,

the five specific real-estate loans mentioned in counsel's letter to the bank were returned, as we have stated, to plaintiff Mabel M. Dearhammer, and subsequently and on August 5, 1947, and prior to the maturity of the note for which all the business chance loans were then pledged as collateral, the bank loaned Kirtley the sum of $11,931, secured by the same business chance loans, which loan was to be repaid by him in monthly installments beginning September 15, 1947.

On November 14, 1947, a receiver was appointed and took possession of all of the assets allegedly belonging to Kirtley, including the securities held as collateral to his note to the bank. On the 9th day of July, 1948, the bank filed its claim with the receiver, and therein it appears without contradiction that Kirtley had made payments on the $11,931 note as follows:

| | |
|---|---|
| August 23, 1947 | $1,725.00 |
| September 5, 1947 | 1,107.33 |
| October 15, 1947 | 600.00 |
| October 24, 1947 | 2,000.00 |

leaving a balance then due thereon to the bank of $6,498.67. Therein it also appears that the receiver had collected on the collateral notes the sum of $3,928.15.

It appears from the record that on August 5, 1947, the only indebtedness owing the bank by Kirtley was evidenced by a note of $11,931; that this was reduced by payments prior to November 14, 1947, the date of the appointment of a receiver, to the sum of $6,498.67; and that all of the unpaid business chance loans made by Kirtley were security for payment thereof. It further appears that some, if not all, of the business chance loans purchased were collateral security for the August 5, 1947, note, and were first used as collateral by Kirtley on November 2, 1946, at which time he secured a loan of $10,775.88 from the bank, and further that from the inception of the first loan until this litigation the business chance loans were continuously used as collateral with the bank for Kirtley's borrowings.

At the conclusion of the evidence, the court discharged the jury—which had been called in an advisory capacity —and made findings in the bank's favor, and specifically found that the evidence did not support plaintiffs' contention that a purchase money trust existed between them and the bank. It further found that the lien of the bank on the collateral securing Kirtley's note of August 5, 1947, was superior to any right or claim of plaintiffs, and, accordingly, dismissed the action.

Plaintiffs have filed five specifications of points, but if our conclusion is correct, none thereof need be discussed. The pivotal question to be resolved here, and one to be determined in limine, is whether the evidence supports the court's findings that the business transactions between plaintiffs and Kirtley there involved were loans, rather than money entrusted and placed with Kirtley for the sole and exclusive use of plaintiffs and whether, if this trust arrangement existed, the bank was properly notified thereof.

██ We have stated that more than thirty times in Mildred's testimony she characterized the business transactions between herself and Kirtley as loans, and, if they were such, what Kirtley may have done with the proceeds thereof was a matter which did not concern the lenders. When Mildred was asked whether she had ever advised the bank of any business arrangement between herself and Kirtley, her answer was, "A. I don't know where I was obligated to notify the Central Savings Bank I was *loaning* Kirtley money. Was it? Q. It wasn't— A. (interrupting) He made financial statements, he could have reported the money I *loaned* him."

From Mildred's deposition we find the following in the record: "Q. I am asking you about your transactions with Mr. Kirtley. As I understand your position, all the money you turned over to Kirtley you loaned to him? A. That is correct. Q. You still want us to believe that? A. I loaned him money, yes, sir. Q. And you never did decide on how much interest you were to

get; I should say, you never had any agreement with him as to how much interest you were to be paid? A. That is correct. Q. Or when the principal was to be returned to you? A. That is correct. Q. And no agreement to place any security for the repayment of any of the loans you made to Kirtley? A. That is right. Q. And you did this without notifying any one else at all? A. My mother knew all this."

It also should be remembered that in the letter of plaintiffs' counsel of July 14, 1947, addressed to the bank, the business transactions between plaintiffs and Kirtley were very definitely designated as loans and as borrowings, and in counsel's letter addressed to Kirtley, under date of July 19, 1947, the business transactions between the plaintiffs and Kirtley were mentioned several times as "loans," the repayment of which was demanded.

■ There is sufficient evidence in the record to support the court's findings that the business transactions between plaintiffs and Kirtley were loans, improvidently made by Mildred to Kirtley, and concerning which the bank was not charged with knowledge. There is not a scintilla of evidence to support plaintiffs' allegations of either force, fraud or coercion.

Accordingly, the judgment of the court, being supported by ample, competent evidence, is affirmed.

MR. JUSTICE HAYS dissents.

MR. JUSTICE HOLLAND does not participate.